# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### at COVINGTON

**CIVIL ACTION NO. 07-87-DLB**

**DAVID KNIGHT, ET AL.**                                          **PLAINTIFFS**

**vs.**                        **MEMORANDUM OPINION AND ORDER**

**STEWART TITLE GUARANTY COMPANY**                        **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In this putative class action lawsuit, defendant Stewart Title Guaranty Company ("STGC") moves to dismiss ten claims related to the charging of excessive title insurance premiums, raising principal arguments as to the applicability of the Kentucky statutes under which certain claims were brought, the existence of various common law duties allegedly owed by STGC, and whether a contract was formed with respect to which the plaintiffs in this case may assert any rights (Doc. # 75). STGC also moves for partial summary judgment as to all claims pertaining to fees charged for an item listed on the HUD-1 Settlement Statement ("HUD-1") as a "title insurance binder," asserting there has been a fundamental misunderstanding as to the services provided in exchange for those fees (Doc. # 74).

STGC is headquartered in Houston, Texas. The putative class is believed to consist of more than 100,000 consumers in Kentucky whose individual claims exceed $50.00.

Accordingly, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A).

## I.      Factual and Procedural Background

STGC is a title insurance company licensed to sell title insurance for properties located in the Commonwealth of Kentucky. Pursuant to KRS § 304.22-020, STGC maintains a schedule of charges, filed with the Kentucky Department of Insurance ("KDOI"), that it must adhere to when selling policies to Kentucky consumers (the "Rate Schedule") (Doc. #1-5).

In order to conduct business locally, STGC regularly employs policy issuing agents, two of which are Stewart Advanced Land Title ("SALT") and Vintage Title Agency, L.L.C. ("Vintage"). SALT and Vintage act on behalf of STGC pursuant to agency agreements dated, respectively, May 14, 2002 and May 2, 2004 (Docs. #74-5 and 74-4). The substantive provisions of these agreements are virtually identical.

The plaintiffs are David Knight and Jackie R. Chandler, who filed suit against STGC on behalf of themselves and a putative class of similarly situated Kentucky residents (collectively "Plaintiffs"). Their claims arise out of certain real estate transactions in which STGC, through its agents, provided title insurance to Plaintiffs and/or their lenders.

On or about September 30, 2005, Jackie Chandler ("Chandler") purchased property in Butler, Kentucky. As a condition to obtaining financing for this purchase, Chandler was required to pay for a lender's title insurance policy in the amount of $132,000.00. (Doc. #76 at 3). The title insurance agent for this transaction was SALT, and the policy was written by STGC. (*Id.*). The appropriate charge for the lender's policy was $339.00, according to the Rate Schedule approved by the KDOI. (Doc. #1-5 at 2). Nevertheless, SALT quoted a

price of $363.00, which was reflected on the HUD-1 and paid for by Chandler. (Doc. #1-6 at 2). SALT never apprised Chandler of the Rate Schedule and failed to disclose that she was entitled to pay a lower rate. Additionally, SALT charged and collected payment in the amount of $50.00 for an item listed on the HUD-1 as a "title insurance binder." According to Plaintiffs, it is unlawful in Kentucky to sell title insurance binders.

On or about March 2, 2007, Chandler purchased another property in Foster, Kentucky. Again, in order to obtain financing, Chandler was required to pay for a lender's title insurance policy in the amount of $162,484.00, and, again, STGC provided the policy while SALT acted as the title insurance agent. (Doc. #76 at 4). In this transaction, the proper charge for the lender's policy, according to the Rate Schedule, was $401.00 (Doc. #1-5 at 2). However, SALT quoted a price of $448.25, which was reflected on the HUD-1 and paid for by Chandler. (Doc. #1-7 at 2). SALT never apprised Chandler of the Rate Schedule and failed to disclose that she was entitled to a lower rate. (*Id.*). Also, SALT charged and collected payment of $50.00 for yet another "title insurance binder."

With respect to David Knight ("Knight"), on or about February 7, 2005, he purchased his residence in Covington, Kentucky, along with a lender's title insurance policy and an owner's title insurance policy, both written by STGC. (Doc. #76 at 4). On or about April 13, 2006, Knight refinanced the existing mortgage on his Covington residence. As a result, his lender required him to purchase a new lender's title insurance policy, in the amount of $132,000.00. (*Id.*). The title insurance agent for the refinancing transaction was Vintage, and the policy was written by STGC. The proper charge for the lender's policy was $339.00, according to the Rate Schedule (Doc. #1-5 at 2); however, Knight was also entitled to a reissue discount based on already having purchased a policy on this property

from STGC. Vintage failed to disclose to Knight that he qualified for the loan reissue rate, instead quoting a price of $341.00, which was reflected on the HUD-1 and paid for by Knight. (Doc. #1-8 at 2). Vintage never apprised Knight of the Rate Schedule and failed to disclose that he was entitled to a lower rate. (*Id.*). Moreover, Vintage charged and collected payment in the amount of $50.00 for a "title insurance binder."

On May 16, 2007, Plaintiffs filed the initial lawsuit. On March 19, 2008, Plaintiffs filed an amended complaint, adding the allegations related to title insurance binder fees. After STGC filed its answer, the parties jointly proposed that their action be stayed pending developments in a similar Kentucky state lawsuit against STGC. Eventually, a tentative settlement agreement was reached in that case, and, on May 15, 2014, Plaintiffs filed a first amended complaint alleging ten causes of action: (1) unjust enrichment, (2) breach of contract and covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation and negligent servicing, (5) civil conspiracy, (6) liability under KRS § 446.070 for violation of KRS § 304.22-020, (7) vicarious liability, (8) breach of fiduciary duty and/or aiding or abetting a fiduciary in the breach of his duty, (9) constructive fraud, and (10) liability under KRS § 446.070 for violation of KRS § 304.12-190. (Doc. #72). The pending motions were filed soon thereafter and are now ripe for decision.

## II. Analysis

### 1. Applicable Law

Federal courts sitting in diversity apply federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). The substantive law of the forum state governs the claims asserted. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Moore v. Coffey*, 992 F.2d 1439 (6th Cir. 1993); *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993). Accordingly,

STGC's motion to dismiss and motion for summary judgment will be considered in light of Rule 12(b)(6) and Rule 56, respectively, while substantive Kentucky will be applied to the individual claims.

### 2. Organization of Claims

The allegations in this case involve two distinct courses of conduct. First, Plaintiffs allege that STGC, through its policy issuing agents, charged premiums in excess of the rates listed in the Rate Schedule,[1] in violation of KRS § 304.22-020, which requires STGC to adhere to the Rate Schedule when charging Kentucky consumers for title insurance policies. Second, at the closing meeting of Plaintiffs' respective transactions, STGC, through its policy issuing agents, allegedly collected fees for an item described on the HUD-1 as a "title insurance binder." Plaintiffs assert that charges for title insurance binders are prohibited under Kentucky law. Based on these allegations, Plaintiffs seek certification for two separate subclasses: 1) the "Filed Rate Subclass", for those persons who were charged and paid for an excess premium, and 2) the "Binder Fee Subclass", for those persons who were charged and paid for a "title insurance binder".

While all ten claims alleged in the complaint explicitly implicate the first course of conduct, only two of the ten claims – breach of contract and negligent misrepresentation – make reference to the second course of conduct. The pending motions filed by STGC also discuss each course of conduct in varying degrees. STGC's motion to dismiss, for example, makes no arguments at all with respect to title insurance binders, instead

---

[1] In some instances, the rate charged simply exceeded the amount in the Rate Schedule for no reason in particular, whereas in other instances, the rate charged failed to account for an applicable loan reissue discount, based on having previously purchased a policy from STGC.

focusing exclusively on each claim as it pertains to excessive premiums. By contrast, the motion for partial summary judgment focuses solely on title insurance binders, and makes no arguments whatsoever with respect to excessive premiums. Because this order addresses the motions filed by STGC, it will also isolate the allegations regarding excessive premiums and title insurance binders, respectively, to the motion to dismiss and the motion for partial summary judgment.

### 3. 12(b)(6) Motion to Dismiss

#### a. Legal Standard

Pleadings shall include a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). Under this standard, the complaint need not contain detailed factual allegations, but it must include more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 555 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a motion to dismiss for failure to state a claim, the Court "must construe the complaint in a light most favorable to the plaintiff, and accept all of [his] factual allegations as true." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). If an allegation is "capable of more than one inference, it must be construed in the plaintiff's favor." *Ashland Hosp. Corp. v. Int'l Bhd. of Elec. Workers Local 575*, 807 F. Supp. 2d 633, 638 (E.D. Ky. 2011) (quoting *Bloch v. Ribar*, 156 F.3d 673, 677

6

(6th Cir. 1998) (citations omitted)). However, the Court "is not bound to accept as true unwarranted factual inferences, or legal conclusions unsupported by well-pleaded facts." *Id.* (internal citations omitted).

### b.    The Scope of Authority of STGC's Policy Issuing Agents

Several of the claims raised in this case are based primarily on the alleged acts of STGC's policy issuing agents, SALT and Vintage. Assuming the truth of Plaintiffs' allegations, liability can be imputed to STGC, the sole defendant, only if SALT and Vintage were acting as their authorized agents during the transactions in question. Therefore, the Court will first explore the existence and scope of these agency relationships, if any, prior to addressing the merits of each claim.[2]

It is helpful to begin by discussing the process of issuing title insurance in general, and the role of policy issuing agents within that process. The following are excerpts from a similar case, *Scott v. First American Title Ins. Co.*, in which this Court addressed such topics in detail.

---

[2] In *Tenhundfeld, et al. v. Chicago Title Ins. Co.*, Case No. 07-23-DLB, this Court denied a motion to dismiss involving similar facts, explaining that it was not "altogether clear on the processing of the title insurance and the premium calculation and disclosure in the flow of information, along with the role of Defendant's agents or representatives." (Doc. 48 at 9-10). The Court did not assess the merits of any claims, and, with respect to the various duties that were alleged, explained that "before [it could] find as a matter of law that no such duty existed," it would have to further explore the nature of title insurance transactions. (*Id.* at 10). Naturally, here, Plaintiffs argue that it would also be premature to dismiss their claims without additional discovery on these issues. But, as STGC correctly notes in its reply, following *Tenhundfeld* this Court did acquire a deeper understanding of title insurance overall, which it demonstrated in *Scott v. American Title Ins. Co.*, 276 F.R.D. 471 (E.D. Ky. 2012). Moreover, STGC has provided a thorough analysis of its relationship with SALT and Vintage in its motion, and attached their respective agency agreements. Given these developments, the Court is better equipped in this case than it was in *Tenhundfeld* to assess the scope of the agency relationships, and the effect they have on the alleged duties.

In a residential purchase or refinance transaction, the buyer as well as the lender providing the mortgage need a guarantee that the buyer will have clear ownership of the property. "Title insurance is designed to provide that guarantee by agreeing to compensate the lender (through a lender's policy) or buyer (through an owner's policy) up to the amount of the loan or the purchase price, respectively." General Accounting Office's Report on Title Insurance, April 2006 (2006 GAO Report). An owner's policy insures the owner/purchaser against defects in the seller's title. By contrast, a lender's policy insures the mortgage lender's security interest against title defects as well as priority of the mortgage lien; thus, the insured is the lender and the policy is provided directly to it. Notwithstanding the benefit to the lender, the financing package the borrower receives usually requires him or her to pay for the title examination and the premium for the new loan policy. However, some lenders offer "no cost" refinances in which the lender bears the cost of the title insurance premium to encourage borrowers to refinance.

Title insurance is sold primarily through use of title agents. Before issuing a policy, an agent inspects the title's history by searching public records such as deeds, mortgages, wills, and divorce decrees. Because public records are usually available only locally, the use of local title agents is desirable. The title insurance premium is paid only once—at the time of sale or refinance—and agents retain or are paid a portion of the premium amount as compensation for their title search work and as commission. (2006 GAO Report). Agents then remit the remaining premium amount to the title company. Because the title insurance policy is not recorded, a borrower's chain of title does not reveal whether a prior mortgage transaction was insured by an owner's or lender's policy, if at all. In fact, title insurance policies usually do not issue until one to two months after closing; a copy is then sent to the lender and to the insurer. The borrower ordinarily does not receive a copy of the policy purchased.

*Scott v. First American Title Ins. Co.*, 276 F.R.D. 471, 473 (E.D. Ky. 2012).

SALT and Vintage act as policy issuing agents for STGC pursuant to their respective agency agreements, dated May 14, 2002 and May 2, 2004 (Docs. #74-5 and 74-4). According to these agreements, both entities are authorized to engage in various activities related to the issuance of title insurance on behalf of STGC, including receiving and processing policy orders, and examining and addressing any title issues that may arise. (*See id.* at 2). Additionally, the agreements provide that each policy must be issued using

forms designated by STGC, and require that various information be collected by the agents and disclosed on those forms. (*Id.*). Agents must also retain a file of all documents supporting each policy issuance, which STGC reserves the right to copy and inspect. (*Id.*). Based on the process as described by STGC, when a title policy is sold, it is SALT and Vintage who calculate and collect the insurance premium (albeit such calculations are supposedly based on STGC's Rate Schedule). (Doc. #75-1 at 7). Typically, STGC will not learn of the sale or of the insured's identity until after the agent sends a copy of the policy along with STGC's portion of the insurance premium. (*Id.*).

These agreements also include limitations of authority; for instance, policy issuing agents are not agents of STGC for the purposes of providing any abstracting or escrow services. (Docs. #74-5 and 74-4 at 3). Likewise, STGC claims that it does not compensate agents for preparing the HUD-1 or otherwise conducting the real estate closing. (Doc. #75-1 at 7). And, of course, STGC also insists that it has no role in calculating or collecting any "title binder fee" that may be charged. (*Id.*). Rather, these activities are paid for by other parties, such as the buyer or lender. As STGC summarizes in its motion, "Except for purposes of issuing and delivering title policies, subject to and in accordance with the terms and provisions of the agency agreements, Vintage and SALT act as independent contractors and are in full and complete control of the operation of their offices." (*Id.* at 9). Accordingly, STGC refers to SALT and Vintage as *limited* policy issuing agents.

Though having conceded that SALT and Vintage are agents for the limited purposes described above, STGC nonetheless disclaims liability for all of their actions in this case, arguing that both SALT and Vintage exceeded the parameters of their agency in dealing with Plaintiffs. (Doc. #75-1 at 13). In support of this argument, STGC relies heavily on

paragraph 3(a) of the agency agreements, which provides that the policy issuing agent "shall conduct its business in a sound and ethical manner, and shall issue title policies according to . . . the rules and instructions . . . imposed by the Department of Insurance or other regulatory body." (Docs. #74-5 and 74-4 at 1). STGC posits that the alleged actions of SALT and Vintage – misrepresenting facts, overcharging for premiums and collecting payment for unlawful title insurance binders – involve exactly the manner of conduct that is "explicitly carved out of their agency" by paragraph 3(a), and therefore concludes that any claims depending on the existence of an agency relationship should be dismissed as a matter of law. (Doc. #75-1 at 13).

In Kentucky, a principal is bound by the acts of an agent that are within the scope of the agent's authority. *Pan-Am. Life Ins. Co. v. Roethke*, 30 S.W.3d 128, 132 (Ky. 2000). This rule has been codified within the Kentucky Insurance Code at KRS § 304.9-035, which states, "Any insurer shall be liable for the acts of its agents when the agents are acting in their capacity as representatives of the insurer and are acting within the scope of their authority." Additionally, the term "agent" has been defined quite simply as "a person who sells, solicits, or negotiates insurance or annuity contracts." KRS § 304.9-020. Clearly, SALT and Vintage both qualify as agents; however, the scope of their respective agency relationships requires further analysis.

Despite STGC's argument, the scope of an agency relationship is not determined exclusively by the actual authority granted in a controlling agency agreement. *See Pan-Am. Life Ins. Co.*, 30 S.W.3d at 132 ("[Defendant's] attempts to avoid the principal-agent relationship by providing otherwise in its agreement with [the agent] . . . are of no avail as the statute overrides any conflicting provisions."). Rather, the doctrine of apparent authority

is firmly established under Kentucky law, *Clark v. Burden*, 917 S.W.2d 574, 578 (Ky. 1996), and fully applicable in the context of insurance sales. *Prima Int'l Trading v. Wyant*, 6:07-338, 2009 WL 722609, at *7 (E.D. Ky. Mar. 17, 2009) ("[Defendant] cannot cloak an agent with representative authority and then complain, relative to a harmed customer, when the agent exceeds his marching orders in executing that authority.").

Therefore, the central question here is whether the facts establish that SALT and Vintage were acting under the authority of STGC, actual or apparent, throughout their dealings with Plaintiffs. In a case involving life insurance agents, the court answered this question in the affirmative, based on the simple observation that the agent's conduct "appear[ed] to be the usual, ordinary, everyday acts commonly pursued by an insurance agent engaged in selling premium financed life insurance policies." *Helton v. Am. Gen. Life Ins. Co.*, 946 F. Supp. 2d 695, 712 (W.D. Ky. 2013). Certainly, if the same rationale is applied here, at least some of the alleged acts of SALT and Vintage could likewise be described as the "usual, ordinary, and everyday acts" of a title insurance agent acting in his representative capacity. This is particularly true with respect to the calculation and collection of insurance premiums, tasks which most reasonable people would expect to be performed by a title insurance agent.

Overall, when construing the first amended complaint in a light most favorable to Plaintiffs, SALT and Vintage were acting as the authorized agents of STGC in certain key respects. Accordingly, with most of the following claims, the existence and scope of the alleged agency is sufficiently established, even at this early stage of litigation. Yet, for other claims, which are noted throughout in the following analysis, additional discovery will be necessary as to the particular aspects of the supposed agency relationship.

### c. Individual Claims Raised by Plaintiffs

#### i. Liability Pursuant to KRS § 446.070 for Violation of KRS § 304.22-020

Plaintiffs assert liability pursuant to KRS § 446.070 for violation of KRS § 304.22-020. Specifically, the complaint states, "Stewart Title or its authorized agents have failed to adhere to its own rates, charging higher than original rates and charging original rates when substitution loan reissue rates are applicable under its own rate Schedule." (Doc. #72 at 23). STGC does not dispute these facts. Instead, the issue is whether or not Plaintiffs can invoke KRS § 446.070 to support their claim.

Like most states, Kentucky regulates the title insurance industry through a state insurance department, the KDOI. Pursuant to KRS § 304.22–020(1), a title insurer must file its schedule of premium rates with the KDOI prior to selling insurance. Additionally, subsection 3 states that a title insurer "shall *adhere* to the rates so filed by it." KRS § 304.22–020(3) (emphasis added).

KRS § 446.070 codifies the doctrine of *negligence per se*, stating, "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." Thus, in order for a plaintiff to avail himself of this statute, he must show that he is "a member of the class of persons intended to be protected by the regulation, and the injury suffered must be an event which the regulation was designed to prevent." *Alderman v. Bradley*, 957 S.W.2d 264, 267 (Ky. Ct. App. 1997); *McCarty v. Covol Fuels No. 2, LLC*, 978 F. Supp. 2d 799, 808 (W.D. Ky. 2013). Plaintiffs can make neither showing because,

according to STGC, KRS § 304.22-020 is designed to protect only the policy holder, which in this case are Plaintiffs' lenders, not Plaintiffs themselves.

STGC relies on *Michals v. William T. Watkins Mem'l United Methodist Church*, 873 S.W.2d 216, 219-20 (Ky. Ct. App. 1994), wherein the court held that the parents of children who were injured from asbestos exposure (in violation of applicable Kentucky regulations) were not able to bring a claim pursuant to KRS § 446.070 for their own mental distress. STGC likens the Plaintiffs in this case to the parents in *Michals,* thus concluding that KRS § 446.22-020 is inoperative here as well. However, it is the children, not their parents, with which Plaintiffs bear the strongest resemblance. The intent of the asbestos regulations was to prevent injuries occurring from exposure to asbestos, which the children unfortunately sustained. Likewise, based on a plain reading of the statute, KRS § 304.22-020 is intended to prevent those who *pay* for title insurance from paying any amount other than that listed in the title insurer's filed rate schedule. Thus, by paying premiums in excess of the Rate Schedule, Plaintiffs suffered precisely the injury KRS § 304.22-020 seeks to prevent.

STGC's contention that KRS § 304.22-020 is designed to protect the insured, as opposed to the rate-payer, is also debunked by the very circumstances of this case, because while the statute has most likely been violated, the insured, who still has his policy, has suffered no injury whatsoever. As Plaintiffs state in their response, "If the rate-payer is not protected by the statutory command that '[t]he insurer shall adhere to the rates as so filed by it,' it is hard to surmise who is protected." (Doc. #76 at 20).

Therefore, construing the first amended complaint in a light most favorable to Plaintiffs, and drawing all inferences in their favor, Plaintiffs' claim alleging a violation of KRS § 304.22-020 will not be dismissed.

## ii. Liability Pursuant to KRS § 446.070 for Violation of KRS § 304.12-190

Plaintiffs also assert liability pursuant to KRS § 446.070 for violation of KRS § 304.12-190. Again, the complaint states, "Stewart Title or its authorized agents have failed to adhere to its own rates, charging higher than original rates and charging original rates when substitution loan reissue rates are applicable under its own rate Schedule." (Doc. #72 at 28). And, again, STGC concedes these facts while disputing the applicability of KRS § 446.070, given the nature of the underlying statute. In this instance, however, STGC's position is quite persuasive.

KRS § 304.12-190 concerns illegal dealing in premiums, prohibiting the collection of premiums where (1) "insurance is not then provided or is not in due course to be provided"; (2) the collected sum exceeds "the amount actually expended or in due course to be expended for the insurance"; or (3) the collecting party fails to return "any sum collected as premium or charge for insurance in excess of the amount actually expended for insurance." KRS § 304.12-190.

Whereas KRS § 304.22–020 demands adherence to the rate schedules filed with the KDOI, and thus protects individuals who *pay* for title insurance, KRS § 304.12-190 penalizes the failure to adequately provide coverage in exchange for the premium charged, and therefore protects those who *receive coverage*. As Plaintiffs are not the insured parties in this case, it would follow that they are not within the class of persons which KRS § 304.12-190 seeks to protect. Additionally, and for the same reason, Plaintiffs have not, and cannot, assert any injury from inadequate coverage that might be remedied under KRS §

304.12-190. Thus, it appears neither of the conditions necessary to invoke KRS § 446.070 are present under these facts.

In their attempt to prove otherwise, Plaintiffs rely on *Kendrick v. Standard Fire Ins. Co.*, No. 6:06-141, 2007 WL 1035018 at *8 (E.D. Ky. Mar. 31, 2007), in which this Court stated, "While the Insurance Code provides oversight of the insurance industry, one of the purposes of that oversight is the protection of the insurance-buying public." Based on this language, Plaintiffs surmise that the Court "properly found . . . that KRS § 304.12-190 is intended for the protection of those consumers who *pay* for insurance." (Doc. #76 at 20). (emphasis added). Plaintiffs' interpretation is quite a stretch, and, as STGC points out, *Kendrick* has since been interpreted "as being limited to the question of whether *policyholders* have a private cause of action [based on KRS § 304.12-190]." *Franklin Cnty., Ky. v. Nationwide Mut. Ins. Co.*, Case No. 3:08-46, 2008 WL 5330521 at *5 (E.D. Ky. Dec. 17, 2008) (emphasis in original).

Overall, these Plaintiffs are not among the class of persons which KRS § 304.12-190 seeks to protect, nor have they suffered an injury which it seeks to prevent. Accordingly, STGC's motion to dismiss is **granted** with respect to this claim.

### iii. Breach of Contract and the Covenant of Good Faith and Fair Dealing and Unjust Enrichment

Plaintiffs' claim for breach of contract and the covenant of good faith and fair dealing is based primarily on the allegation that STGC, or its authorized agents, failed to adhere to the approved Rate Schedule. According to Plaintiffs, these facts demonstrate a breach of the contractual duties owed by STGC while selling title insurance policies to Plaintiffs' lenders. STGC does not dispute these allegations; rather, the contested issue is whether

Plaintiffs are in fact parties to the contracts in question. STGC submits that Plaintiffs are not, and therefore requests dismissal of this claim, noting the covenant of good faith and fair dealing runs only to the actual parties of a given contract.

The contracts at issue are the lender's title insurance policies. These contracts, according to STGC, are between the Plaintiffs' lenders as the insured parties, STGC as the insurer, and <u>no one else</u> (and certainly not the Plaintiffs). STGC insists that the mere fact that Plaintiffs paid for these policies does not establish privity of contract. To support this proposition, however, STGC relies primarily on decisions that apply the law of another jurisdiction to circumstances that are distinct from the case at bar. In fact, the only decision cited by STGC that is on-point from a factual standpoint directly supports Plaintiffs' argument that an implied-in-fact contract can be found under these circumstances. *See Randleman v. Fid. Nat. Title Ins. Co.*, 465 F. Supp. 2d 812, 819 (N.D. Ohio 2006) ("These facts sufficiently allege that the plaintiffs entered into an implied-in-fact contract with Fidelity under which Fidelity, in consideration of the plaintiffs' anticipated payment at closing of the premium for the title insurance being charged by Fidelity, agreed to issue a title insurance policy to the plaintiffs' lender.").

Again, Plaintiffs argue they were each a party to an implied-in-fact contract with STGC. Under Kentucky law, an implied-in-fact contract is a "true contract, shown by evidence of facts and circumstances from which a meeting of the minds concerning the mutual promises may be reasonably deduced." *Acuity Ins. Co. v. Higdon's Sheet Metal & Supply Co. Inc.*, 3:06:162, 2007 WL 1034986 at *7 (W.D. Ky. Apr. 3, 2007) (citation and internal quotations omitted). The mutual promises here, according to Plaintiffs, consist of STGC's promise to provide a title insurance policy, in exchange for Plaintiffs' respective

promises to pay for the policy. Plaintiffs submit that it is of no consequence that the policy they purchased was for the benefit of their lenders. After all, that was simply a condition Plaintiffs were required to fulfill to obtain financing.

Like STGC, Plaintiffs rely on a case outside of Kentucky; however, the case Plaintiffs cite involves circumstances which are almost identical to their own. In *Chesner v. Stewart Title Guar. Co.*, 1:06CV476, 2006 WL 2252542 (N.D. Ohio Aug. 4, 2006), the plaintiffs also purchased a title insurance policy for the benefit of their lenders as a condition to obtaining financing. Moreover, the company selling the policy was none other than STGC. *Id.* at *1. Faced with a transaction strikingly similar to the one at bar, the court in *Chesner* found the plaintiffs had pled sufficient facts to support a breach of contract claim. *Id.* at *5. The court described the three-party transaction as the "most obvious example of the use of the implied contracts concept." *Id.*

If a contract is found to exist with respect to which Plaintiffs are deemed parties, STGC argues in the alternative that any duty to charge a lawful rate would have been breached *only* during contract formation, and, as STGC explains, the implied covenant of good faith and fair dealing does not apply to contract formation. Technically, STGC's position is consistent with the plain language of the Kentucky UCC, which states, "Every contract or duty under this code shall impose an obligation of good faith in its *performance or enforcement*." KRS § 45A.015 (emphasis added). However, contract formation is not the only point at which STGC could have breached its good faith duty to charge a lawful premium. For instance, one could certainly argue that if contract formation consisted of choosing the policy and selecting the price, then contract performance occurred when STGC delivered the policy and Plaintiffs paid the premium. And, just as STGC's failure to

17

quote a lawful rate during formation constitutes a breach of good faith and fair dealing, so to does its failure to collect a lawful rate during performance.

Upon review, Plaintiffs have pled facts sufficient to show both the existence of an implied-in-fact contract, as well as STGC's breach of good faith and fair dealing during the performance of that contract. Accordingly, their claim for breach of contract should not be dismissed.

On a related matter, Plaintiffs also assert a claim for unjust enrichment, which is based on the allegation that STGC, or its agents, unlawfully overcharged for title insurance premiums and thereby came into possession of money it had no right to keep. While again conceding the facts, STGC argues that Plaintiffs cannot maintain both breach of contract and unjust enrichment claims. STGC's position may eventually have merit; however, at this point in the proceeding, Plaintiffs are certainly permitted to entertain alternative pleadings. *See Holley Performance Prods., Inc. v. Keystone Auto. Operations, Inc.*, No. 1:09-00053, 2009 WL 3613735, at *5-6 (W.D. Ky. Oct. 29, 2009). Thus, as Plaintiffs note in their response, until the existence or nonexistence of a valid contract is clearly established, it would be premature to dispose of the unjust enrichment claim. *Id.* at *6 ("[T]his case has not advanced so far that the contract has been clearly established by the Court as valid and enforceable. Therefore, ... at this early state of litigation, it is proper for [plaintiffs] to allege both its claim for breach of contract and unjust enrichment."). The Court agrees.

### iv.     Breach of Fiduciary Duty

Plaintiffs also bring a claim for breach of fiduciary duty and/or aiding or abetting a fiduciary in the breach of his duty. Specifically, the complaint alleges that Plaintiffs, who lacked bargaining power and superior knowledge as to insurance rates, trusted and relied

18

upon STGC and its agents to assist with their closings and to sell them title insurance in a lawful and truthful manner. (Doc. # 72 at 26). Plaintiffs therefore assert that STGC owed them a fiduciary duty, which it breached by failing to apprise Plaintiffs of the applicable Rate Schedule; failing to apprise Knight that he qualified for a reissue discount; and failing to otherwise charge rates in accordance with the Rate Schedule. STGC, however, disputes that it ever owed Plaintiffs a fiduciary duty in the first place.

A party owing a fiduciary duty must place the interests of the party to which the duty is owed above his own. *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002). "Fiduciary relationships arise when circumstances and the relationship of the parties show the parties understood and agree that confidence is reposed by one party and trust accepted by the other." *Id.* at 893. Additionally, though "[f]iduciary relationships can be informal, [they] must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other." *Id; see also Kendrick v. Standard Fire Ins. Co.*, Case No. 06-141, 2007 WL 1035018 (E.D. Ky. Mar. 31, 2007) ("Kentucky law recognizes that implication of fiduciary relationships cannot be precisely defined, given that the circumstances giving rise to them can vary.").

STGC argues that a fiduciary relationship cannot be found here since the complaint fails to allege "contact of any kind" between STGC and the Plaintiffs. (Doc. # 75-1 at 18). However, this argument is flawed in that it presupposes the actions of SALT and Vintage cannot be imputed unto STGC as a matter of law. As explained above, at best, such a ruling would require additional discovery as to the issue of agency; but in all likelihood, the allegations suggest that SALT and Vintage were indeed acting under STGC's authority in certain key respects.

Next, STGC argues that a commercial transaction will not, by itself, give rise to a fiduciary relationship, because it is expected that a seller will seek to charge the highest possible rate despite the buyer's "hope to pay the lowest possible [rate]." *Sallee*, 286 F.3d at 893. Obviously, though, the Sixth Circuit did not intend for this to mean that a fiduciary relationship can never exist within a commercial transaction. Rather, it is but a factor to consider when applying the general rule; i.e., that the existence of a fiduciary relationship is determined from the circumstances of each case. Additionally, because STGC is legally required to adhere to the Rate Schedule, it is questionable whether the transaction between Plaintiffs and STGC even qualifies as "commercial" in nature, at least in the manner contemplated by the court in *Sallee*.

Finally, STGC cites two Kentucky cases that purportedly detract from the notion that a fiduciary relationship can exist in the context of insurance sales. *See Fed. Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 845 (Ky. 1986), overruled on other grounds by *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176 (Ky. 1989) ("The only fiduciary relationship we recognize attaching to insurance policies is the excess-of-the-policy-limits cases where good faith is required on the part of the insurance company."); *Acuity Ins. Co. v. Higdon's Sheet Metal & Supply Co. Inc.*, 3:06 CV 162, 2007 WL 1034986, at *7 (W.D. Ky. April 3, 2007) ("[T]he Court finds and the parties cite no published Kentucky case that applies [a fiduciary duty] to an insurance agent's relationship with an insured.").

However, *Kemper* and *Acuity* have not been cited extensively for the propositions upon which STGC rely here. Moreover, both cases are at odds with *Kendrick v. Standard Fire Ins. Co.*, No. 6:06-141, 2007 WL 1035018 at *16 (E.D. Ky. Mar. 31, 2007), wherein this Court stated, "In the context of insurance, Kentucky law imposes a fiduciary duty upon an

insurer for the benefit of an insured based upon the relationship between them arising from the insurance contract." Ultimately, in *Kendrick*, the plaintiff's fiduciary duty claim was found sufficient to withstand threshold dismissal. *Id.*

Finally, it also noteworthy that the pertinent issue here is whether a fiduciary duty runs to Plaintiffs, who are *non-insured third parties*, whereas in each of the cases above, the court addressed whether a fiduciary duty was owed to the *insured*.

While much of the case law cited by both parties is not controlling due to factual distinctions, or because it applies the law of another jurisdiction, at least the Sixth Circuit's decision in *Sallee* supplies a starting point for the proper analysis. The existence of a fiduciary relationship is determined from the factual circumstances of each case. Those circumstances must demonstrate an established trust between the parties based on an exchange of confidences. Accordingly, here, the issue will turn on, *inter alia*, the extent of interaction between Plaintiffs and STGC's agents, the scope of authority granted by STGC to those agents, and, perhaps, the existence of a contract with respect to which Plaintiffs may be a party. For example, the complaint alleges that SALT and Vintage assisted with Plaintiffs' respective closing transactions. Ultimately, it may be found that such actions were within the authority granted by STGC, and that these actions, combined with the selling of title insurance, established the requisite level of trust between the parties. Or, if a contract does exist between Plaintiffs and STGC, perhaps the manner in which it was formed required an exchange of confidences that supports a fiduciary duty. With respect to each of these examples – and, presumably, others exist – there is simply too much yet to discover that has a meaningful impact upon whether STGC owed Plaintiffs a fiduciary duty. Thus, it is premature to dismiss Plaintiffs' claim.

### v. Fraud, Constructive Fraud, Negligent Misrepresentation and Negligent Servicing

As to Plaintiffs' claim of fraud, the first amended complaint alleges STGC made false and materially misleading misrepresentations regarding the applicable charges for title insurance, and, moreover, failed to disclose the Rate Schedule and certain loan reissue rate information despite being under a duty to speak. According to Plaintiffs, affirmative misrepresentations were made in writing on the HUD-1, which was prepared by STGC or its agents during Plaintiffs' respective closing transactions. Plaintiffs further submit that STGC and its agents knew of the falsity of these statements (and the deceptive effect of their omissions), and "intended to mislead Plaintiffs and others into relying on the misrepresentations that the premium being charged adhered to [the Rate Schedule]." (Doc. # 72 at 18). STGC argues this claim should be dismissed for three reasons, specifically, that the complaint fails to plead an actual misrepresentation; fails to identify a source of STGC's alleged duty to speak; and fails to establish that Plaintiffs relied on or were induced by STGC's alleged misrepresentations.

In support of its position that Plaintiffs have failed to state a claim, STGC emphasizes the heightened pleading standards required of claims of fraud pursuant to FRCP 9(b). Though mental states "may be alleged generally," FED. R. CIV. P. 9(b), the circumstances evincing fraud "must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993). Thus, a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent." *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942-43 (6th Cir. 2009) (citation and internal quotations omitted). However, Plaintiffs note the purpose of FRCP 9(b) is only "to provide defendants with notice of the specific conduct with which they were charged, so that the defendants can prepare responsive pleadings." *Crowe v. Trustgard Ins. Co.*, Case No. 12-240, 2013 WL 2243965, at *2 (E.D. Ky. May 21, 2013) (citation and internal quotations omitted). As this Court held in *Crowe*, even "brief"allegations of fraud can be sufficient to enable defendants to respond. *Id.*

With this standard in mind, STGC first argues that the complaint fails to identify a single false statement made by STGC or its agents. The fees listed on the HUD-1, STGC reasons, were completely accurate as to the amount that was ultimately charged and paid; that these amounts do not reconcile with the Rate Schedule does not make them false or misleading. STGC cites to a case with similar facts, in which the Fourth Circuit affirmed dismissal of plaintiffs' claim for negligent misrepresentation, finding the charges listed on the HUD-1 were not at all false because "the dollar amount listed on the HUD-1 statement under title insurance was the amount charged and collected by Ticor." *Arthur v. Ticor Title ins. Co. Of Florida*, 569 F.3d 154, 162 n.3 (4th Cir. 2009). Plaintiffs offer no counter argument in their response, which instead focuses exclusively on the elements of fraud by omission. Thus, it seems the thrust of Plaintiffs' claim does not pertain to misrepresentations on the HUD-1 itself, but on the omissions regarding the Rate Schedule and loan reissue rates, and whether or not STGC was under a duty to speak.

Both parties agree that a claim of fraud by omission requires a plaintiff to prove: 1) that defendant had a duty to disclose the facts omitted; 2) that defendant failed to disclose such facts; 3) that plaintiff was induced to act by the failure to disclose; and 4) that plaintiff

suffered damages as a result. *Rivermont Inn v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003). As to the first element, moreover, "A duty to disclose facts is created only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure." *Id.*

Accordingly, STGC's next argument is that it did not owe a duty to disclose, and that the complaint fails to establish the source of any such duty. Though STGC may be correct as to the absence of a statutory duty, it is of no consequence, as two of the other sources listed in *Rivermont* have been sufficiently pled. First, STGC came under a duty to disclose by informing Plaintiffs of the rates they would be charged, without also apprising Plaintiffs of the lower rates contained in the Rate Schedule. Because Plaintiffs were legally entitled to these lower rates (including any loan reissue discounts), by only ever discussing the higher rates, STGC partially disclosed material facts while creating the impression of full disclosure. Second, Plaintiffs have alleged facts supporting a fiduciary relationship, which provide yet another source of STGC's duty to disclose.

Assuming an omission did occur, STGC's final argument is that Plaintiffs could not have relied thereupon due to having constructive notice of the lawful rates, as listed in the Rate Schedule filed with the KDOI. Stated another way, STGC contests whether the alleged fraud actually *induced* Plaintiffs to act. In support of its position, STGC relies on *Moore, Own, Thomas & Co. v. Coffey*, wherein the Sixth Circuit held, "It is well established under Kentucky law that 'equity will grant no relief to a complaining party who has means of knowledge of the truth or falsity of representations . . . .'" 992 F.2d 1439, 1447 (6th Cir. 1993) (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1108 (Ky.

1931)). However, STGC omits an equally important aspect this analysis. The Sixth Circuit went on to explain that "[i]f the truth or falsehood of the representation might have been tested by *ordinary diligence and attention*, it is the party's own folly if he neglected to do so, and he is remedyless." *Id.* (emphasis added). Most importantly, the Sixth Circuit reversed the district court's decision, holding that "there is an unresolved material issue of fact as to whether Moore could have discovered the [misrepresentation] through 'ordinary diligence and attention.'" *Id.*

In essence, as to whether a plaintiff claiming fraud by omission carries the burden of investigating the representation – lest he be foreclosed from pleading reliance – *Moore* applies a reasonable person test. STGC insists that Plaintiffs were capable of investigating the Rate Schedule before their respective closings, and because they did not, their claims should be dismissed. Of course, Plaintiffs assert the opposite. "It would be an absurd rule, however, that imposes on consumers the duty to scour state regulatory filings when entering into transactions and absolves large commercial entities with superior knowledge who could simply disclose the rates they are legally authorized to charge." (Doc. #76 at 19). The Court agrees. No reasonable consumer should be expected to enter a closing armed with the KDOI's rate schedules in tow. To rule otherwise would likely violate the reasonable person test. Finally, as a general observation with respect to reliance, it is axiomatic that a person's decision to pay an amount for title insurance would most certainly be affected by the knowledge that she is legally entitled to a lower rate.

Overall, STGC has failed to establish that Plaintiffs can prove no set of facts entitling them to relief under a claim of fraud. Though the rates stated on the HUD-1 may not constitute a misrepresentation, failing to disclose the legally mandated premium rates and

loan reissue rates certainly qualifies as an omission in the face of a duty to speak. When construing the first amended complaint in a light most favorable to Plaintiffs, the source of this duty could have arisen from the alleged fiduciary relationship between Plaintiffs and STGC, or, from STGC making a partial disclosure, and thereby creating the impression of full disclosure. Finally, the element of reliance has also been sufficiently pled in this case. Plaintiffs have asserted they were induced by the undisclosed Rate Schedule, and STGC's counter-argument concerning constructive notice fails due to an open issue of fact, namely, whether "ordinary diligence" would have required Plaintiffs to obtain and review the Rate Schedule prior to their respective closings.

Furthermore, Plaintiffs have satisfied the applicable pleading standard. They have alleged the dates the title insurance policies were purchased; the rates that were charged; the lawful rates listed on the Rate Schedule; STGC's knowing failure to disclose the Rate Schedule; and the common nature of STGC's scheme to deceive Plaintiffs. Such allegations are sufficient to enable STGC to prepare a responsive pleading. Accordingly, Plaintiff's claim of fraud will not be dismissed at this juncture.

On a related matter, the complaint also states a cause of action for constructive fraud, which, under Kentucky law, is tantamount to a claim for fraud without the element of intent. *Wood v. Kirby*, 566 S.W.2d 751, 755 (Ky. 1978) ("Constructive fraud arises through some breach of a legal duty which, irrespective of moral guilt, the law would pronounce fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests."). Plaintiffs allege the proper facts to make this claim, and, in its motion, STGC makes no additional or distinctive arguments in opposition. Thus, based on

the same analysis used to address the claim of fraud, it would likewise be inappropriate to dismiss Plaintiffs' claim for constructive fraud.

Additionally, the complaint alleges negligent misrepresentation. As to the elements of this claim, Kentucky has adopted the Restatement (Second) of Torts § 552. *See Presnell Const. Managers*, Inc., 134 S.W.3d 575, 580 (Ky. 2004). Section 552 states, in pertinent part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977).

Negligent misrepresentation is also similar to a claim of fraud; the primary distinction being that the requisite intent is merely negligence. *Id.* Plaintiffs have made the proper factual allegations to account for this difference, and to support a claim for negligent misrepresentation overall. In its motion, STGC reiterates the lack of a misrepresentation, as well as Plaintiffs' constructive notice of the Rate Schedule. However, these arguments fail for the same reasons discussed above. Accordingly, threshold dismissal of Plaintiffs' claim for negligent misrepresentation would be improper.

Finally, Plaintiffs state a cause of action for negligent servicing; however, the complaint does not allege any separate facts upon which this claim is based, and Plaintiffs provide no case authority recognizing a claim of negligent servicing under Kentucky law.

Having conducted its own search, the Court finds that none exists. Therefore, Plaintiffs' claim for negligent servicing is **dismissed**.

### vi.    Civil Conspiracy

Plaintiffs' claim for civil conspiracy alleges STGC, "both individually and in concert with unknown, or yet to be identified independent agents, or separate legal entities serving as local agents," committed the various acts and omissions discussed at length herein, causing Plaintiffs to suffer economic loss. (Doc. #72 at 22-23). STGC argues that Plaintiffs' claim is time-barred, noting specifically that Chandler's first instance of being overcharged occurred in September 2005, while Knight was deprived of a reissue discount in April 2006. With respect to these transactions in particular, STGC notes the filing of the original complaint, on May 16, 2007, occurred after the expiration of the one-year statute of limitations. STGC does not argue that Chandler's second instance of being overcharged is time-barred, as it occurred in March 2007.

To succeed on a claim of civil conspiracy under Kentucky law, "the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002). An unlawful act includes tortious conduct. *Id.* Moreover, one is subject to liability if he is directly involved with the tortious act, knows of the tortious act and provides substantial assistance or encouragement with respect thereto, or provides substantial assistance to another who achieves a tortious result, while his own acts separately constitute a breach of duty to the third person who was harmed. *Id.* And, unlike in the criminal context, the concerted action must result in actual damages. *Id.*

Based on the first amended complaint, the substantive elements of a claim for civil conspiracy have been sufficiently pled, and STGC offers no arguments regarding the merits. The only issue is whether any of the transactions have been barred by the statute of limitations, which is one year, pursuant to KRS 413.140(1)©.

Plaintiffs first note, correctly, that Chandler's 2007 transaction falls within the statute. As to the 2005 and 2006 transactions, Plaintiffs emphasize that the statute is measured from the time the cause of action *accrues,* which does not occur until the final act of the conspiracy is complete. *Dist. Union Local 227, Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Fleischaker*, 384 S.W.2d 68, 72 (Ky. 1964) ("We believe that a conspiracy which contemplates a series of overt acts is a continuing conspiracy and the statute does not commence to run until the last overt act performed in compliance with the objective of the conspiracy has been accomplished."). Plaintiffs explain the conspiracy at issue includes "[STGC's] collection of data and audits concerning Plaintiffs' overcharges, and subsequent failure to disclose and correct the overcharges." (Doc. #76 at 14). This conduct, Plaintiffs suggest, would have realistically occurred within a year prior to May 2007, and would likely pertain to all transactions alleged in the complaint, including those which took place in 2005 and 2006.

Construing the first amended complaint in the light most favorable to Plaintiffs, it is plausible that STGC engaged in the collection of data and the performance of audits following any one of Plaintiffs' transactions. Indeed, such activities are explicitly referenced in STGC's agency agreements. (Docs. #74-5 and 74-4 at 2). It is also plausible that STGC discovered the overcharges at issue and subsequently failed to disclose or remedy these oversights. Plaintiffs' allegations thus constitute overt acts in furtherance of a continuing

29

conspiracy, tolling the point at which Plaintiffs' claim would have accrued. Therefore, STGC's motion to dismiss the civil conspiracy claim is **denied** for all transactions, so as to allow Plaintiffs to adduce the details and timing of STGC's alleged conspiracy.

### 4.    Motion for Partial Summary Judgment

#### a.    Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

Rule 56, which governs motions for summary judgment, states that parties are generally required to support factual assertions "by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). If a non-moving party demonstrates that certain facts

essential to his opposition are unavailable, the court may "allow time to obtain affidavits or declarations or to take discovery." FED. R. CIV. P. 56(d). If such discovery is needed, it is the non-movant's obligation to inform the court by filing an affidavit pursuant to Rule 56(d). *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002). This filing should express the non-movant's "need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000).

Where a non-movant files a Rule 56(d) affidavit, and the district court grants summary judgment without permitting any discovery at all, on appeal, the Sixth Circuit is likely to find an abuse of discretion. *Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011); *see also Vance v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996) ("If the non-movant makes a proper and timely showing of a need for discovery, the district court's entry of summary judgment without permitting him to conduct any discovery at all will constitute an abuse of discretion."); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008) ("Typically, when the parties have no opportunity for discovery, denying the Rule 56(f) motion and ruling on a summary judgment motion is likely to be an abuse of discretion.").[3]

However, despite this being an "oft-repeated" rule, *Thomason v. Amalgamated Local No. 863*, 438 F. App'x 358, 361 (6th Cir. 2011), the Sixth Circuit has affirmed a grant of summary judgment without discovery in some limited circumstances, such as where the Rule 56(d) affidavit was overly vague, or if "further discovery would not have changed the

---

[3] Following *CenTra, Inc.*, amendments to Rule 56 moved the provisions formerly contained in subsection (f) to their current position, subsection (d). *Alspaugh*, 643 F.3d at 167 n. 1.

legal and factual deficiencies" of the non-movant's arguments. *CenTra, Inc.*, 538 F.3d at 420 (citation and internal quotations omitted).

### b.    Disputed Terminology

Within their claims for breach of contract and negligent misrepresentation, Plaintiffs allege that STGC charged for an item listed on the HUD-1 as a "title insurance binder." The crux of both claims is that line 1104 of the HUD-1 reflects a fee for a temporary insurance policy, also called a binder, which is prohibited in Kentucky pursuant to KRS § 304.14-220. STGC moves for partial summary judgment as to any such claims, asserting that Plaintiffs fundamentally misunderstand the service that was actually provided. According to STGC, the fees in question were not for an insurance binder, but rather for a title commitment, which is not prohibited under Kentucky law.

### i.    Insurance Binders

KRS § 304.14-220 is contained within the Kentucky Insurance Code. Its title is one word – "Binders" – and the first line of subsection one reads, in part, "Binders or other contracts for temporary insurance . . . ." KRS § 304.14-220. Thus, understandably, Plaintiffs believe this statute and line 1104 of the HUD-1 refer to the same thing. As to precisely what that is, the Sixth Circuit explained in *Rabb v. Public National Insurance Co.*:

> We recognize the well settled rule in Kentucky, as in other states, that a so-called 'binder' or temporary insurance until the regular policy is executed and delivered, when issued by an authorized agent, can constitute a valid contract of insurance even though the written binder may not specifically set out the essential elements about which the minds of the parties must have met.

32

243 F.2d 940, 943-44 (6th Cir. 1957). Based on KRS § 304.14-220 and the court's description in *Rabb*, an insurance binder is simply a temporary policy that provides coverage until the regular policy becomes effective.

On the assumption that line 1104 of the HUD-1 represents a fee for temporary insurance, Plaintiffs solicited an opinion letter from the Kentucky Office of Insurance asking whether such charges were lawful. (Doc. #33). General Counsel explained that while KRS § 304.14-220 permits other forms of temporary insurance, binders for title insurance are specifically exempt under subsection four. KRS § 304.14-220(4). "Consequently, it is a prohibition of the Kentucky Insurance Code to bind title insurance with a temporary binder." (Doc. #33 at 1). Of course, this finding is in large part what prompted Plaintiffs' claims.

### ii.    Title Commitments

STGC admits that the similarity between the phrasing on the HUD-1 and that which is used in KRS § 304.14-220 is "an unfortunate and confusing coincidence." (Doc. #74-2 at 1). Nevertheless, according to STGC, Plaintiffs attach the wrong meaning to the term "title insurance binder," at least in this particular context. STGC insists that it has never sold temporary insurance, or "binders," either directly or through its agents, and that it certainly did not sell any such product to Plaintiffs during the transactions in question. Rather, the charge on line 1104 of the HUD-1, STGC explains, represents the agent's fee for preparing a document known as the title commitment.

To establish what a title commitment is, and distinguish it from an insurance binder, STGC submits the affidavit of Charity R. Makela ("Makela"), who has worked for the past eight years as Regional Claim Counsel for STGC. (Doc. #74-3). Makela attests that a title commitment is typically prepared in Kentucky transactions that involve policy issuing

33

agents, like SALT or Vintage. (Id.). The title commitment details the terms under which the insurer will provide title insurance. "A title commitment is not a policy, and it is not a contract. Instead, it reflects, in a standardized format, a listing of the conditions necessary to issuance [sic] of an actual title insurance policy." (Id.). Makela notes that a title commitment is sometimes provided even though a policy is never ultimately issued, and also reiterates that STGC does not receive any portion of the fee charged for a title commitment by its policy issuing agents.

Furthermore, STGC refers to the general instructions for completing the HUD-1, which state in Appendix A to Part 3500, "Line 1104 is used for the title insurance binder which is also known as a commitment to insure." (Doc. #74-6). According to STGC, this description clearly demonstrates that the HUD-1 refers to a title commitment, rather than some form of temporary insurance as Plaintiffs suggest.

### c.    Plaintiffs' Rule 56(d) Affidavit

In its response to STGC's motion, Plaintiffs explain that because no discovery has occurred to this point, granting summary judgment would be exceedingly premature. Thus, attached to Plaintiffs' response is an affidavit filed pursuant to Rule 56(d), requesting permission from the Court to conduct further discovery into the matter of title insurance binder fees. (Doc. #77-1). The items Plaintiffs believe would assist in their opposition to summary judgment include, *inter alia*, documents reflecting any services that justify the title insurance binder fees charged; communications between STGC and its agents regarding title insurance binders; communications between STGC and Kentucky consumers regarding charges for title insurance binders; and the depositions of any corporate

witnesses with pertinent knowledge, including one of Makela, so as to discuss the contents of her affidavit. (*Id.* at 2).

In its reply, however, STGC reiterates that summary judgment can be appropriate, even where no discovery has occurred, if the non-movant fails to show that the discovery requested would change the legal or factual deficiencies identified in the motion. (Doc. #83 at 2). "This is just such a case," according to STGC, who describes Plaintiffs' affidavit as a series of "broad, generic requests designed to troll for some unpled and unsubstantiated wrongdoing." (*Id.* at 5). STGC asserts that the information provided in its motion unequivocally demonstrates that the fees in question were for a run-of-the-mill title commitment, which, in turn, negates any possibility that such fees were unlawfully charged. As such, STGC believes the Court has more than ample facts to dispose of these claims, and should thus reject Plaintiffs' request for additional discovery.

STGC's argument is unconvincing. The motion for summary judgment and Makela's affidavit do provide some useful information. They define what a title commitment is and adequately distinguish that term from an insurance binder. And when combined with the HUD-1 instructions, they also indicate, perhaps, that line 1104 refers to the former, and not the latter. Yet, the deciding factor is not which term the HUD-1 actually refers to. Instead, the more salient issue is what product or service, in truth, was provided and subsequently charged for on line 1104. Until STGC can prove these fees were not paid in exchange for an insurance binder, a genuine issue of material fact will remain unsettled. Thus far, all that is offered is a plausible alternative; however, STGC still has not proven that a title commitment was actually conducted with respect to either of Plaintiffs' transactions. And even if such facts had been established, STGC would have to somehow reconcile the title

commitment provided to the fifty dollar charge listed on the HUD-1. Of course, none of this has occurred, but as Plaintiffs suggest, perhaps it could if additional discovery is taken pursuant their Rule 56(d) affidavit.

Plaintiffs have undoubtedly raised genuine issues of material fact with respect to their claims for unlawful title insurance binder fees. Though STGC has identified a plausible alternative to these allegations, it has failed to establish the limited circumstances in which summary judgment is proper despite the absence of any discovery whatsoever. Thus, STGC's motion for partial summary judgment is premature, and is **denied**.

## III. Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     STGC's Motion to Dismiss (Doc. # 75) is hereby **GRANTED** with respect to Plaintiffs' claims for vicarious liability, negligent servicing and liability pursuant to KRS § 304.12-190, and **DENIED** with respect to all remaining claims; and

(2)     STGC's Motion for Partial Summary Judgment (Doc. # 74) is hereby **DENIED**.

This 6th day of October, 2014.



Signed By:

*David L. Bunning*

**United States District Judge**

G:\DATA\Opinions\Covington\2007\07-87 Grant in Part MTD Deny MSJ.wpd