**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 07-87-DLB-CJS**

**DAVID KNIGHT, ET AL.**                                                                    **PLAINTIFFS**

**vs.**                              **MEMORANDUM OPINION AND ORDER**

**STEWART TITLE GUARANTY COMPANY**                                          **DEFENDANT**

************

Plaintiffs David Knight and Jackie Chandler, on behalf of themselves and others similarly situated, seek class certification on their unjust enrichment, fraud, constructive fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, civil conspiracy, and statutory claims against their title insurance company, Stewart Title Guaranty Company (STGC).   Specifically, Knight and Chandler allege that STGC overcharged them and other title insurance purchasers in two ways: (1) by charging premiums that did not include discounts available under STGC's filed rate schedules; and (2) by allowing STGC agents to charge an additional $50 fee for the preparation of a "title binder" or "title commitment" document.   Plaintiffs seek certification of two distinct classes–one for each type of alleged overcharge.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A).

I.      **Factual and Procedural Background**

STGC is a corporation headquartered in Texas that is authorized to underwrite and issue title insurance policies in Kentucky.   (Doc. # 86 at ¶¶ 9, 10).   Kentucky law requires

1

title insurers like STGC to file a schedule of the risk portion of the premium rates they charge for title insurance with the Kentucky Department of Insurance (KDOI) and to adhere to those rates when selling title insurance policies in Kentucky.  Ky. Rev. Stat. Ann. § 304.22-020.  Any amendment to or modification of the rate schedule must also be filed with KDOI.  *Id.*

Like many title insurance companies throughout the country, STGC issues title insurance in Kentucky through policy issuing agents who act pursuant to agreements with STGC.  (*See, e.g.*, Doc. ## 74-3, 74-4, 74-5).  Before issuing a policy, the agent typically performs a title examination, for which it charges a fee to the purchaser.  (Doc. # 74-3 at ¶ 3).  Those title examination fees are retained by the policy-issuing agents, not STGC.  (*Id.*)  The agent also prepares a title commitment (at times called a title insurance binder) that details the terms under which STGC will issue a title policy.  (*Id.* at ¶ 4; Doc. # 108-19 at 4).  The policy issuing agent, not STGC, retains the fee for preparing the title commitment.  (Doc. # 74-3 at ¶ 4.)  The agent then calculates and charges a premium using STGC's filed rates, a portion of which is remitted to STGC after the closing of the transaction.  (*Id.* ¶ 5).  Knight's and Chandler's premiums and agents' fees (including binder fees) were recorded on HUD-1 forms (a federally published document used in real estate closings).  (Doc. ## 108-14; 108-17; 108-18).

STGC issues title insurance policies to both owners and lenders to insure against defects in the seller's title.  Buyers receiving financing are often required to purchase policies for the benefit of their lenders.  According to its agency agreement with STGC, the agent retains copies of the documents supporting the title search and examination and STGC may examine the agent's files.  (*See, e.g.*, Doc. ## 74-4, 74-5).

2

Plaintiffs Knight and Chandler seek certification of two (2) classes: a "Premium Overcharge"[1] class and a "Binder Fee" class.  The Court will examine the facts related to each proposed class in turn.

### A.   "Premium Overcharge" Class

Plaintiff Knight purchased a home in Covington, Kentucky in February 2005.  (Doc. # 72 at ¶ 32).  As part of that transaction, he purchased both an owner's and a lender's title insurance policy.  (*Id.*)[2]  When Knight refinanced his mortgage a year later, in 2006, he was required to purchase a new lender's policy.  (Doc. # 72 at ¶¶ 33-34).  His second lender's policy was issued by STGC, and his policy issuing agent was Vintage Title Agency LLC. (Doc. # 108-14).  Knight claims that, under the rate schedule in effect at the time of his second lender's policy, he was entitled to a 60% discount of the original lender's rate of $339.  (Doc. # 72 at ¶¶ 35-36).   Instead, Knight was charged $341 and did not receive a discount.  (Doc. # 108-14).   Knight is the proposed representative for the "premium overcharge" class, defined as:

all persons or entities in the Commonwealth of Kentucky who, between December

---

1    Starting in their class certification briefing, Plaintiffs call this proposed class the "Premium Upcoding" class.  The term "upcoding" is most often used to describe a fraudulent medical billing practice where a payor is billed for a service more complex (and therefore more costly) than the service a patient actually received.  *See, e.g.*, Centers for Medicare & Medicaid Servs., Dep't of Health & Human Servs., *Health Care Fraud and Program Integrity* 4, 7-8 (May 2016), https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/fwa-overview-booklet.pdf.  Title insurance premiums, unlike medical procedures, are not commonly billed using numeric codes, and do not reflect the cost of a specific service rendered. Accordingly, the Court finds the term "upcoding" to be confusing and inapplicable in this context. There is no need for Plaintiffs to reinvent the linguistic wheel–"overcharge" is an apt, familiar word that the Court has used before to describe Plaintiffs' allegations (*see generally* Doc. # 84) and a word that both sides used repeatedly throughout their briefing.  For those reasons, the Court will refer to this class as the "Premium Overcharge" class.

2    Discovery revealed that those policies were issued by Chicago Title Company, which is not a defendant.  (Doc. # 112-18 at 3).

1, 2003 and up to the date that the Court enters an Order certifying the Class, were charged an original title insurance premium by Stewart Title as defined by the operative fee schedules on file with the [KDOI] and when:

> (a) there was an existing title insurance policy issued by Stewart Title on the insured property within the applicable date threshold to receive a reissue premium as reflected by the operative fee schedules on file with [KDOI]; or (b) a refinance loan was made to the same borrower on the same property, and the prior loan was covered by title insurance issued by Stewart Title within the applicable date threshold to receive a substitution or refinance premium as reflected by the operative fee schedules on file with [KDOI].

(Doc. # 108-1 at 1).

The parties have identified three separate rate schedules in effect during the proposed class period–the first operative from 2003-2007 (when Knight purchased his policy), the second from 2007-2013, and the third from 2013 to today.  (Doc. ## 112-15, 112-16, 112-17).  Each rate schedule sets out premium rates for original title insurance policies and, crucially, offers a discounted premium rate for a title insurance policy if title to the property was previously insured within a certain time period.

It is this discounted premium rate that Knight argues he and his fellow class members, who purchased policies between 2003 and today, were entitled to and did not receive.  But the devil is in the details.  The operative rate schedules vary in their requirements for premium discount eligibility, with some schedules requiring presentment of certain kinds of evidence to prove the existence of a prior policy, some schedules requiring the prior policy to be issued by STGC, and some schedules disclaiming any obligation by STGC to uncover evidence of eligibility.  The varying terms of the rate schedules are summarized below.

### 1.      Rate Schedule 2003-07

The rate schedule in effect from 2003 until 2007 offered "reissue premiums" for

owner's and lender's policies.  "When the same property has been insured by [a] policy issued by any title insurance company licensed to do business within ten (10) years prior to" the application for the new policy, the reissue premium for the owner's policy was set at 60% of the premium for an original owner's policy.  (Doc. # 112-15 at 1).  It offered a similar discount for lender's policies: "[w]hen the owner of property on which application is made for loan or mortgage title insurance has been insured by an Owner's or Leasehold Policy covering the same property within ten (10) years prior to such application," reissue premiums for a lender's policy were set at 60% of the premium for an original lender's policy.  (*Id.*)

The rate schedule also offered a "substitution title insurance premium" with a sliding discount scale based on the age of the original loan "[w]hen a substitution loan is made to the SAME borrower on the SAME property, title to which was insured by [STGC] by the issuance of a loan or mortgage policy."  (*Id.*)  In addition to the requirement that the prior policy be issued by STGC, the substitution premium required an additional showing: "[i]n order to receive [the substitution premium] rates, [STGC] must be advised that these rates are applicable; provided with the number of its former policy; and given the amount of the unpaid principal balance secured by the original insured loan or mortgage."  (*Id.*)

### 2.   Rate Schedule 2007-13

The second rate schedule, in effect from 2007 to 2013, contained different terms. Reissue premiums for owner's policies were set at 50% of the premium for an original owner's policy.  (Doc. # 112-16 at 4).  The rate schedule also contained a presentment requirement, which provided that, "[i]n order to be entitled to a reissue premium for an owner's or leasehold policy, the owner of the property must provide evidence of the prior

5

owner's or leasehold policy.  The following may be relied on as such evidence: [a] copy of the prior owner's or leasehold policy; or [a] copy of the signed HUD-1 or other settlement statement that indicates that the transaction actually closed, that the premium was paid for the prior policy, and that discloses the amount of insurance issued in the prior policy; or [a] statement from the agent who closed the prior transaction confirming that an owner's or leasehold title insurance policy was issued and stating the amount of the prior policy." (*Id.*)

The rate schedule further stated that "[n]either the agent nor [STGC] is under any obligation to determine the existence of a prior policy or the eligibility for a reissue premium. The existence of a prior or existing mortgage lien does not obligate Stewart Title or its agent to provide any reduction in original title insurance premium charges." (*Id.*)  Reissue premiums for lender's policies had similar terms.

In lieu of the substitution premiums it previously offered, STGC's rate schedule created "refinance premiums," which applied "when a refinance loan is made to the same borrower on the same property, and the prior loan was covered by title insurance issued within the past five (5) years by any insurance company authorized to conduct business in the Commonwealth of Kentucky." (Doc. # 112-16).  As with the reissue premiums, "[i]n order to be entitled to a refinance premium for a loan policy, the borrower must provide evidence of the prior loan policy," and STGC stated that it was not obligated to determine the existence of a prior policy or an insured's eligibility for a refinance premium.

### 3.    Rate Schedule 2013-Present

The third rate schedule, which went into effect in 2013, also contains different terms. The reissue premiums for owner's policies are set at 70% of an original owner's policy. And there are no reissue premiums for lender's policies–instead, "[a] refinance charge

applies for policies insuring a replacement or refinance loan on property subject to an institutional mortgage dated and recorded within the previous five years." (Doc. # 112-17). With respect to both types of discounted premiums, the rate schedule states that STGC "is under no obligation to seek or make a determination of the existence of a previous policy." (*Id.*)

### B.    Title Binder Fee Claims

Plaintiffs Knight and Chandler were each charged $50 by STGC's policy-issuing agents for what the HUD-1 form identified as a "title insurance binder" when they purchased their title insurance policies.  (Doc. ## 108-14, 108-17, 108-18).  This fee was not part of STGC's filed premium and was not paid to STGC.  Plaintiffs move for certification of a "Binder Fee" class, with both Knight and Chandler as representatives,

> consisting of all persons or entities in the Commonwealth of Kentucky who, from May 15, 2004 and up to the date the Court enters an order certifying the Class, were charged a fee identified as a "title insurance binder" or a "title commitment" for a title insurance policy that was issued by [STGC].

(Doc. # 108-1 at 1).

## II.    Analysis

### A.    Standard of Review

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  "In order to justify a departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'"  *Id.* at 348-49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

7

Accordingly, the named plaintiffs must meet the requirements of Rule 23 to "sue or be sued as representatives on behalf of all members" of a class.  Fed. R. Civ. P. 23.  Rule 23(a) contains four prerequisites: numerosity, commonality, typicality, and adequacy of representation.  *Id.*; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (explaining that the prerequisites "limit the class claims to those fairly encompassed by the named plaintiff's claims").  In addition to meeting Rule 23(a)'s prerequisites, the proposed class must also satisfy one of the three subsections of Rule 23(b).  *Wal-Mart*, 564 U.S. at 345.  Here, Plaintiffs seek to certify their class under subsection (b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard."  *Wal-Mart*, 564 U.S. at 350.  Rather, the party seeking certification must "affirmatively demonstrate his compliance with the Rule."  *Id.*  Certification is "proper only if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Id.* (internal quotation marks omitted).  The same goes for Rule 23(b)(3)'s requirements–"[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

Although district courts must not "engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013), a rigorous analysis of the Rule 23 factors will often "entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart*, 564 U.S. at 351.  That is because "the

8

class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Falcon*, 457 U.S. at 160.

## B.    "Premium Overcharge" Class

### 1.    The Class Definition

"[C]ourts must be vigilant to ensure that a certified class is properly constituted." *Powers v. Hamilton Cty. Public Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). The Supreme Court has "repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156. Therefore, before reaching the Rule 23 requirements, the Court must consider two questions. The first is whether Knight has standing to represent the proposed "premium overcharge" class at all. The second is whether the class is sufficiently definite.

First, Plaintiffs' proposed class definition includes only those class members with a prior title insurance policy *issued by STGC*. (Doc. # 108-1 at 1) (requiring that, before the transaction giving rise to the claim, there be "an existing title insurance policy issued by [STGC]" or a "prior loan covered by title insurance issued by [STGC]"). This requirement is a problem for Plaintiffs because STGC points to record evidence, which Knight does not dispute, that Knight's prior policy was issued by Chicago Title Insurance Company, not STGC. (*See* Doc. # 112-18 at 3; Doc. # 113 at 2-3). If the sole named plaintiff is not a member of the class he seeks to have certified, certification is inappropriate. *Heard v. Mueller Co.*, 464 F.2d 190, 194 (6th Cir. 1972).

In their Reply, Plaintiffs acknowledge the "apparently inartful wording" of their class definition (Doc. # 113 at 2) and urge the Court to focus on STGC's alleged overcharges for subsequent policies instead of the identity of the issuer of the prior policies. And because

9

"district courts have broad discretion to modify class definitions," the Court will modify the proposed class definition not to require a prior STGC policy so that it may analyze the remainder of Plaintiffs' class certification motion. *Powers*, 501 F.3d at 619.

Second, "[b]efore a court may certify a class pursuant to Rule 23, the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012) (internal quotation marks omitted). To meet that standard, "the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Id.* at 538 (internal quotation marks omitted).

Here, the criteria for class membership are objective, although complicated. Class members must be individuals or entities in Kentucky that purchased title insurance from STGC between December 1, 2003, and today. They must have been charged the original title insurance premium (or greater) under the operative rate schedule then on file with KDOI. And at the time they were charged that premium, they must have had an existing title insurance policy within the applicable date range under the operative rate schedule to receive a reissue or refinance premium.[3] Geographical boundaries, dates, and the price of premiums charged and collected are "classic categories of objective criteria." *Young*, 693 F.3d at 538. As a result, the proposed class is not too "'amorphous or imprecise'" to be certified. *Id.* (quoting 5 James W. Moore, et al., *Moore's Federal Practice* § 23.21[1] (3d ed. 1997)).

---

3    The class definition does not require "eligibility" for the premium, nor could it. That would create an impermissible fail-safe class. *See Young*, 693 F.3d at 537-58.

10

STGC challenges whether it is administratively feasible to access the information needed to identify potential class members without individual file-by-file review (or even individual testimony), given that the documents confirming the existence of prior policies would be in the possession of the issuing agents, not STGC. Plaintiffs suggest that policy-issuing agents can be subpoenaed, but due to the date range in the class definition, STGC notes that, of the 25 agents Plaintiffs proposed for subpoena, 15 were out of business and others had no information to produce, meaning that Plaintiffs did not present evidence from any subpoenaed agent in support of their motion. (Doc. # 112 at 10). STGC also argues that Stewart Prior Files, a web-based program with information about policies issued by STGC, contains incomplete records and could not meaningfully assist in identifying class members. Instead, individualized proof will be required to ascertain class membership, which STGC argues precludes class certification.

Even if the Court assumes that STGC's prediction of file-by-file review will come to pass, the Sixth Circuit has instructed that "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification." *Young*, 693 F.3d at 539. "If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained. . . . It is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies." *Young*, 693 F.3d at 540 (internal quotation marks omitted).

11

In this case, the lack of Rule 23(a) prerequisites of commonality and typicality and Plaintiffs' inability to show that common issues predominate are far more serious barriers to class treatment. To reach those issues, the Court assumes that determining membership in the class is administratively feasible.

### 2. Rule 23(a) Prerequisites

#### a. Numerosity

The party seeking class certification must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no strict numerical test for determining the impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Instead, courts must examine the specific facts of each case. *Id.* "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by numbers alone." *Id.*

Plaintiffs assert that they have established numerosity for the Premium Overcharge class with mathematical calculations. Plaintiffs start with a base number of over 200,000 STGC premiums charged at the original rate during the class period. Second, Plaintiffs assume that STGC made an error in its rate assessment in 1% of those policies, leaving over 2,000 suspect transactions.[4] Plaintiffs further assume that only 25% of the remaining transactions represent policies of unique individuals or entities who actually had prior policies within the applicable date range, which results in over 500 possible class members.

---

4    This assumption is apparently based on a recent, uncited STGC rate filing with KDOI, where the company acknowledged that its agents "occasionally" make errors in rate assessments. (Doc. # 108-1 at 20.)

STGC asserts that the estimate is "nothing more than rank speculation." (Doc. # 112 at 31). The Court does not find Plaintiffs' percentage estimates persuasive, untethered as they are from any record evidence. In a footnote, however, Plaintiffs explain that the significant disparity between the percentage of refinance discounts given by STGC (5% of all policies received a refinance rate) and national statistics on the prevalence of refinances (40-80% of Fannie Mae and Freddie Mac mortgages were refinances) suggests that many more of the 200,000 transactions done by STGC in the class period were mortgage refinances, meaning that a prior mortgage (and therefore a lender's title insurance policy) probably existed. (Doc. # 108-1 at 20 n.7).

Had Plaintiffs connected the dots between the national statistics and STGC's percentage of reissues, numerosity would probably not be a difficult question. As it is, however, the Court bases its denial of certification on failure to satisfy the commonality, typicality, and predominance requirements, and leaves numerosity for another day.

### b.    Commonality

The party seeking class certification must also show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This language "is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" *Wal-Mart*, 564 U.S. at 349 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 349-50 (quoting *Falcon*, 457 U.S. at 157). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. Rather, the class members' "claims must depend upon a common contention . . . that is capable of classwide resolution–which

means that determination of truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Stated another way,

> [w]hat matters to class certification . . . is not the raising of common 'questions'–even in droves–but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).

Plaintiffs seek class certification for negligence per se (from a statutory violation), breach of contract, unjust enrichment, breach of fiduciary duty, fraud, constructive fraud, and negligent misrepresentation.  (Doc. # 108-1 at 25-32)  Plaintiffs' core contention for all these claims, repeated throughout their briefs, is that STGC's failure to require all of its agents to use Stewart Prior Files when issuing policies, which would help verify whether a prior policy existed, "had a common adverse impact on the class (read: incurring an overcharge) for which [STGC] should be found legally responsible."  (Doc. # 108-1 at 22-23; *id.* at 13, 26-27, 28, 29; Doc. # 113 at 5).

However, this "common contention" is not sufficient to meet Rule 23(a)(2)'s requirement.  At the most basic level, Plaintiffs fail to show that the class members "have suffered the same injury."  *Id.* at 349-50 (internal quotation marks omitted).  At least some members of the proposed class, *including the proposed class representative*, suffered no injury from STGC's failure to mandate use of Stewart Prior Files because their prior files were not issued by STGC and therefore would not be included in the database.  In seeking to fit all their claims under one roof, Plaintiffs have left Knight (and, presumably, unnamed class members) out in the cold.

14

There are other reasons that Plaintiffs' claims are not susceptible to classwide proof that drives the litigation forward. The gravamen of Knight's claims are that he (and others in the proposed class) were entitled to and did not receive premium discounts, and the resulting overcharge harmed them.[5] But entitlement to the discount for many proposed class members turns on the circumstances of the individual transactions.

Because the class definition is so broad, the putative class encompasses individuals who could have qualified for a substitution loan under the first rate schedule (which requires a prior STGC policy), a reissue or refinance loan under the second rate schedule (which contained an explicit requirement that evidence of a prior policy be presented), or a reissue or refinance loan under the third rate schedule (in which STGC disclaimed its obligation to determine eligibility for discounts). Or, like Knight, a putative class member might be entitled to a reissue discount under a rate schedule with no presentment requirement or disclaimer at all. (*See* Doc. # 113 at 2).

The starkly differing terms of the three rate schedules encompassed in the class period undermines Plaintiffs' argument that class treatment could "generate common

---

5    All of the claims include actual injury as an element. *See* Ky. Rev. Stat. Ann. §§ 304.22-020(3) (title insurance company "shall adhere" to its rate schedule), 446.070 (to succeed on negligence per se claim, person must be "injured" by the "violation" of a statute and "may recover . . . such damages as he sustained by reason of the violation"); *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 193 (breach of fiduciary duty action requires proof of injury and causation*); Rivermont Inn v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003) (claim of fraud by omission requires proof that a plaintiff suffered actual damages as a result of a failure to disclose); *Presnell Constr. Mgrs., Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004) (negligent misrepresentation claim subjects supplier of false information "to liability for pecuniary loss caused to them by their justifiable reliance upon the information"); *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (unjust enrichment claim requires a "benefit conferred upon defendant at plaintiff's expense" and "inequitable retention of benefit [by defendant] without payment for its value"). Plaintiffs do not mention by name the civil conspiracy claim alleged in their Complaint, but the analysis for that claim is the same. In Kentucky, the action for civil conspiracy is one "for damages caused by acts committed pursuant to a formed conspiracy," because without damages "no civil action lies against anyone since the gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy." *James v. Wilson*, 95 S.W.3d 875, 897 (Ct. App. Ky. 2002).

answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (internal quotation marks omitted).  If Knight (and others like him) were entitled to a discounted rate whether he presented evidence of a prior policy or not, his claim cannot be decided in the same stroke as that of an individual who was entitled to a discounted rate only if she produced evidence of a prior policy.

Plaintiffs try to get around this by arguing that the presentment requirement and STGC's disclaimer may be legally void.  That is a merits question.  But even if Plaintiffs ultimately prevail on that argument, the fact that a significant legal question exists for some members of the class but not for others, including the named plaintiff, show that commonality (and typicality, *see infra* at 19-20) is lacking.  "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350.  The propriety of class treatment cannot hinge on a crucial merits question being decided in a particular way in the future.  *See id.* ("Th[e] common contention, moreover, must be of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

Other district courts to have confronted proposed classes like this one have reached similar conclusions.  In *Chesner v. Stewart Title Guar. Co.*, No. 06-cv-476, 2009 WL 585823, at *8 (N.D. Ohio Jan. 9, 2009) (*Chesner II*), the court decertified a class similar to the one proposed here because the rate manual required that "the evidence of the actual prior policy must be provided," and "[t]here is simply no question that Plaintiffs cannot provide class-wide proof establishing that every class member purchased a prior lender's policy.  To do so, every individual file must be examined in detail." *Id.*

16

Similarly, the Sixth Circuit affirmed the decertification of a class of Ohio ratepayers who alleged they were not granted discounts they were entitled to because "determining liability would require an examination of each individual policy [defendant] issued to determine if [defendant] had received a copy of the prior policy or 'other information' suggesting that such a policy had previously been issued.  Under this framework, establishing that [defendant] received this information is essential to proving liability and, as the district court found, a highly individual inquiry." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 353 (6th Cir. 2011) (holding that common questions did not predominate); *see id.* (explaining that "district courts in Ohio considering similar class actions brought against other title insurers have all concluded that common issues do not predominate and have either denied class certification or decertified classes").  *See also Scott v. First Am. Title Ins. Co.*, 276 F.R.D. 471, 478 (E.D. Ky. 2011) ("Far from resolving the entitlement issue in one stroke, the resolution of whether a putative class member qualified for a discount that he or she failed to receive requires highly individualized fact-based inquiries into each borrowers' relevant real estate transactions because discounts are applicable under First American's rate scheme only if title to the property was previously insured."); *Corwin v. Lawyers Title Ins. Co.*, 276 F.R.D. 484, 490 ("[I]nstead of liability being established 'in one stroke,' it would take an assessment of each transaction to determine if the absent class member qualified for the discount rate.").

Contrary to Plaintiffs' contention, the Jefferson County Circuit Court's certification of a different overcharge case in *Finney* does not suggest that common questions are presented here.  *Stewart Title Guar. Co. v. Finney*, No. 11-499, 2012 WL 5378813 (Ky. Ct. App. Nov. 2, 2012).  That case encompassed claims regarding fees under only one rate

17

schedule–the 1999 rate schedule. *Id.* at *3. And the trial court found that policy-issuing agents "monolithically followed" the directives of 1994's higher-rate schedule (that KDOI had rejected) even when the 1999 rate schedule was meant to apply, meaning that the agents necessarily denied the lower 1999 rates and discounts to every insurance purchaser. *Id.* at *4-5. There is no such common contention here.

In *Finney*, "[t]he primary dissimilarity [among class members STGC] identified [wa]s the number of policies each Stewart insured has purchased, which agent they purchased the policies from, and in what region of Kentucky the insureds reside." *Id.* at *5. The district court held that those dissimilarities did not impact the import of common proof because "[t]he number of policies does not affect the rates and discounts used" and "[t]here is no evidence that the identity of the agent or the area where the customer lives is relevant to whether the agents used the 1999 rates and discount." *Id.* In this case, the dissimilarities are much more significant and central to liability. For the putative premium overcharge class, eligibility for the discounts for some individuals may turn on whether and what type of evidence of a prior policy was provided prior to the settlement. And there are three operative rate schedules that give multiple answers to that question. By contrast, the *Finney* case contains no mention of a presentment requirement for any class members. Certification in *Finney* does not control certification here.

Plaintiffs do raise other questions, such as "whether [STGC] can be held liable for the conduct of its agents; whether [Ky. Rev. Stat. Ann.] § 304.22-020 protects the rate-payer or only the policyholder; and whether [STGC] owed Plaintiffs and the [class] a duty to disclose the correct rates." (Doc. # 108-1 at 23). But "reciting these questions is not sufficient to obtain class certification" because the answers to these questions are not "apt

to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.  As a result, they do not satisfy the commonality prerequisite.  *Id.*

### c.    Typicality

The party seeking class certification must also demonstrate that his or her claims or defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Stated another way, the class members' claims must be "fairly encompassed by the named plaintiffs' claims." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013) (internal quotation marks omitted).  This ensures that "the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members."  *Id.* at 853.

In practice, the concepts of typicality and commonality often overlap.  *See Wal-Mart*, 564 U.S. at 349, n.5 (stating that both prerequisites "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (internal quotation marks omitted).

As with commonality, typicality is frustrated in this case because the operative rate schedule when Knight's claim arose included no presentment requirement and no anti-obligation language.  Plaintiffs "maintain, and intend to prove at summary judgment or trial,

19

that this language is void and unenforceable." (Doc. # 108-1 at 5). But regardless of the legal merits of that argument, Knight does not need to prove it to win on his claim. The typicality requirement is not satisfied when "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.* Like in *Sprague*, "[t]hat premise is not valid here" because Knight's claim depends on his interactions with STGC and its agent, which occurred pursuant to different operative rate schedules than others he seeks to represent. *See id.* at 397-99 (decertifying a class on commonality and typicality grounds because of "myriad variations" in representations made by the defendant company to plaintiff retirees). Therefore, Plaintiffs cannot show the required typicality.

### d.    Adequacy of Representation

STGC does not contest the adequacy of representation prong of Rule 23(a). In light of the proposed class's fatal flaws in commonality, typicality, and predominance, the Court sees no need to address that prerequisite.

### 3.    Rule 23(b) Criteria

Rule 23(b) sets forth three circumstances in which class actions may be certified.[6] The third subsection, and the one that Plaintiff seeks to utilize, is an "adventuresome

---

6       The first subsection "covers cases in which separate actions by or against individual class members would risk establishing 'incompatible standards of conduct for the party opposing the class,' or would 'as a practical matter be dispositive of the interests' of nonparty class members 'or substantially impair or impede their ability to protect their interests.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997) (quoting Fed. R. Civ. P. 23(b)(1)(A) & (B)). The second authorizes class actions "for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

innovation," which "added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded."  *Id.* (internal quotations omitted).  It is "[f]ramed for situations in which 'class-action treatment is not as clearly called for[,]'" but "'may nevertheless be convenient and desirable.'" *Id.* (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).   "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).

### a.    Predominating Common Questions

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).  That said, predominance "does *not* require a plaintiff seeking class certification to prove that *each element* of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (internal quotation marks omitted).  The common issues need only predominate.

21

In this case, common issues do not predominate.  The key question of liability for all of Plaintiffs' claims turns on whether individuals were actually entitled to a discounted rate.  That question cannot be answered without an individualized inquiry into every transaction because the rate schedules impose varying terms, some of which call for particularized proof of a previous title policy.  For the same reasons that the class fails to satisfy the commonality and typicality requirements, Rule 23(b)(3)'s predominance requirement is not met either.  Indeed, the overwhelming trend in title insurance overcharge cases like this one is to deny certification for precisely these reasons.  *See supra* at 13-20. This class is no different.

### b.    Superiority of the Class Action

Although the relatively small dollar amounts mean that class treatment may be warranted because "class members are not likely to file individual actions," the prohibitive problems with commonality, typicality, and predominance mean that class treatment is not superior.  *In re Whirlpool*, 722 F.3d at 861.

### C.    Binder Fee Class

The binder fee claim that Plaintiffs seek certification to pursue is not the same claim they raise in their Complaint.  In the Complaint, Plaintiffs allege that STGC charged them a $50 "binder fee" for a contract for temporary insurance, and that such temporary title insurance contracts are prohibited in Kentucky.  (*See* Doc. # 72 at ¶¶ 2, 3, 45, 46, 83, 123 (referring to the binder fee as "a charge that is expressly prohibited under Kentucky law," "a charge expressly prohibited by statute," "a charge being expressly prohibited by law," "an unequivocal legal fiction," and a "charge[ that] exceeded the amount that should have or could have been legally charged," citing Ky. Rev. Stat. Ann. § 304.14-220(4) (declaring

22

that provisions governing "[b]inders or other contracts for temporary insurance" do not apply to title insurance))).  Plaintiffs also alleged that STGC retained the entirety of the $50 fee.  (*Id.* at ¶¶ 26, 31, 41).  These binder fees form the basis of several causes of action in the Complaint: breach of contract and the covenant of good faith and fair dealing (*id.* at ¶ 83) and negligent misrepresentation (*id.* ¶ 123).  As purported support for their legal theory, Plaintiffs attached an opinion letter from KDOI to their Complaint, which explains that binder fees, to the extent they constitute temporary insurance, are prohibited and should not be passed on to the consumer.  (Doc. # 108-2 at 1).

Now, after discovery, Plaintiffs have "elected not to pursue their theory that the charges for title binders are per se illegal charges for temporary insurance."  (Doc. # 113 at 6).  Instead, they assert that the $50 charges are improper because they should be included in the premium, not "characterize[d]" by policy-issuing agents as search and examination costs.  (*Id.* at 8-9).  Plaintiffs fault STGC for not having a "method to detect and/or stop its agents from overcharging in this manner."  (*Id.* at 9).  The overcharging is to STGC's benefit, according to Plaintiffs, because of negative competition in the title insurance market: although STGC does not retain the binder fees, Plaintiffs claim that STGC "can attract more business from agents, and boost its own market share, by closing its eyes when agents charge and retain junk fees from [STGC's] consumers."  (*Id.*)  In addition, Plaintiffs now seek certification for causes of action beyond the breach of contract and covenant of good faith and fair dealing and negligent misrepresentation claims raised in the Complaint, including negligence per se (for exceeding the filed premium rate, on the theory that the binder fees should be included in the premium), unjust enrichment, breach of fiduciary duty, and fraud.  (*Id.* at 9; *see also* Doc. # 108-1 at 29-32).

23

STGC argues that certification of the Binder Fee class should be denied because, due to the divergence between the Complaint and class certification briefing, STGC did not have fair notice of Plaintiffs' binder fee claims or the grounds on which they rest. (Doc. # 112 at 34-35). *See McDonald v. Franklin Cty.*, 306 F.R.D. 548, 553-54 (S.D. Ohio 2015) (denying class certification where "[n]othing in the operative complaint puts the County on notice that Plaintiff is challenging, on behalf of a class, the County's practice of allegedly permitting a male ID Tech to photograph the private tattoos of female detainees"); *id.* ("Plaintiff cannot circumvent [the denial of a motion to amend] by introducing a new class of individuals in her motion to certify. . . . [T]he new proposed Cross-Gender Class . . . adds a new theory of liability over and above the County's liability for the tattoo policy.").

Plaintiffs counter that STGC is on notice of these claims and that they are permitted to seek certification on the most viable legal theory. For the latter point, Plaintiffs cite *In re Conseco Life Insurance Co. LifeTrend Insurance Sales & Marketing Litigation*, 270 F.R.D. 521, 531-32 (N.D. Cal. 2010). But *Conseco* is not analogous to this case. In *Conseco*, unlike here, the district court ordered supplemental class certification briefing after learning that the Defendant had entered into a regulatory settlement that "altered the nature of plaintiffs' allegations and the scope of the proposed class." *Id.* at 526. Plaintiffs "refined their theory of contract liability as a result of the changes occasioned by the issuance of the regulatory settlement," *id.* at 532, and "clarified their breach of contract claim as a result of the unusual factual developments," *id.* at 532 n.10. They did not add new causes of action or make new factual allegations after their prior claims were undermined by discovery.

Contrary to Plaintiffs' arguments, neither the Complaint, the KDOI letter, Plaintiffs' summary judgment briefing, nor the Court's ruling on summary judgment put STGC on

24

notice of this new claim.  As shown above, the Complaint offers no notice of the new binder fee theory because the overwhelming implication from the Complaint is that the "binder fees" are illegal because contracts for temporary insurance, called binders, are prohibited.

Nor does the KDOI letter put STGC on notice of this new legal theory.  The KDOI letter explains that binder charges, to the extent they constitute temporary insurance, are prohibited and should not be passed on to the consumer.  (Doc. # 108-2 at 1).  It also opines that the rate-filing statutes "serve[] to prevent insurance producers and insurance companies from collecting any amount from the insured for the purchase of insurance that is not filed as a component of the premium."  (Doc. # 108-2 at 2).  "In this case, any charge for the title insurance policy must be filed in as a component of the premium in accordance with [Ky. Rev. Stat. Ann.] § 304.22-020."  (*Id.*).  Plaintiffs pin their hopes on the latter sentence, but to say that the letter "states that the binder charge should be included in the premium, rather than charged separately" is a stretch.  (Doc. # 113 at 7 n.3).  Nothing in the KDOI letter mentions title commitments.

Nor did Plaintiffs give sufficient notice of their new binder fee claim in their opposition to summary judgment.  In their memorandum, Plaintiffs suggested that the binder fees "could be unlawful and predicate facts for Plaintiffs['] other claims.  Defendant has produced no evidence that it or its agents did any work justifying the 'title insurance binder' fees that they were charged, suggesting that the fees are, indeed, merely a method for Defendant and/or its agents to inflate their fees."  (Doc. # 113 at 7 (footnote omitted)).  Plaintiffs go on to explain that the name of the fee is likely to confuse, "making it impossible for the consumer to divine the purpose, if any, of the charges."  (*Id.*)  None of this suggests that binder fees must be charged as part of the premium, or that they are the result of  collusion

between STGC and its policy-issuing agents, which is now the basis of Plaintiffs' Binder Fee class claims.

Plaintiffs also claim the Court's earlier ruling "acknowledged Plaintiffs' premium overcharge theory related to binder fees, and authorized discovery for it." (Doc. # 113 at 8). That is inaccurate. The Court identified a disputed issue of fact as to whether the services actually rendered were for temporary contracts of insurance (as Plaintiffs alleged in their Complaint) or title commitments (as STGC argued). "Until STGC can prove these fees were not paid in exchange for an insurance binder, a genuine issue of material fact will remain unsettled. Thus far, all that is offered [by STGC] is a plausible alternative; however, STGC still has not proven that a title commitment was actually conducted with respect to either of Plaintiffs' transactions." (Doc. # 84 at 35). The Court went on to explain that even if STGC *did* prove that a title commitment was actually conducted, it would have to further link that title commitment *to* the $50 binder fee (to dispel any notion that, for example, *both* a title commitment *and* a temporary insurance contract existed). (*Id.*)

For all of these reasons, class certification of the Binder Fee class is not warranted. The claims Plaintiffs seek to pursue through class treatment have not been pled in their Complaint, and are so divergent from their prior claims that STGC does not have fair notice of the claims or the grounds on which they rest.

## III.   Conclusion

In conclusion, and for the reasons stated herein, **IT IS ORDERED** that:

(1)  Plaintiffs' Motion for Class Certification (Doc. # 108) is **DENIED**; and

(2) **Within ten (10) days of the date of entry of this Order**, Plaintiffs shall file a

status report indicating whether Plaintiffs wish to proceed with their individual claims.

This 13th day of January, 2017.



Signed By:

*David L. Bunning*

**United States District Judge**

K:\DATA\ORDERS\Cov07\07-87 Knight MOO.wpd